UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

                                            Case No. 10-20137
                                            Hon. Gerald E. Rosen

MICHAEL LAMAR CATHEY, *et al.*,

    Defendants.
_____/

**OPINION AND ORDER DENYING
DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on       December 10, 2010

PRESENT: Honorable Gerald E. Rosen
                      Chief Judge, United States District Court

## I. INTRODUCTION

Count One of the March 25, 2010 indictment in this case charges seven of the ten named Defendants with conspiracy to possess with intent to distribute and to distribute heroin and marijuana, in violation of 21 U.S.C. § 846. In the remainder of the 12-count indictment, various combinations of the ten Defendants are charged with money laundering (Count Two), use of a communication facility in facilitating the commission of violations of the Controlled Substances Act (Counts Three through Seven), being a felon in possession of a firearm (Counts Eight through Ten), possession with intent to

distribute marijuana (Count Eleven), and criminal forfeiture (Count Twelve).[1]

On November 15, 2010, the Court held a hearing on a number of pending motions. The Court subsequently issued a November 17, 2010 order resolving the bulk of these motions, but one motion was held in abeyance, and the Court indicated at the conclusion of the November 15 hearing that three other motions would be addressed in a separate opinion: a pair of motions brought by Defendants Michael Lamar Cathey and Dajuan Lamarr Wren seeking to suppress the evidence obtained through Title III intercepts, and a motion brought by Defendant Wren seeking to suppress evidence seized from his Royal Oak residence. For the reasons stated on the record at the November 15 hearing, as supplemented by the rulings below, the Court denies these three motions to suppress.

## II. ANALYSIS

### A. Defendant Cathey's and Defendant Wren's Motions to Suppress Evidence Obtained Through Title III Intercepts

By order dated January 29, 2009, U.S. District Judge George Caram Steeh authorized the interception of communications to and from a T-Mobile cell phone registered to "Tynone Williams" and believed to be used by Defendant Michael Lamar Cathey. On February 27, 2009, U.S. District Judge Victoria A. Roberts entered an order extending the authorization for interception of these communications. Through motions filed by Defendants Cathey and Dajuan Lamarr Wren (and joined by Defendants Michael

---

[1]A superseding indictment was issued on September 29, 2010, but it does not significantly differ from the initial indictment, apart from including an additional individual (Krismen Gooden) among the Defendants charged with the Count One conspiracy offense.

2

Allen Randolph and David Martin Wynn), Defendants seek to suppress all of the evidence obtained in the course of these Title III wiretaps, as well as all fruits of this surveillance, on the ground that the affidavits submitted in support of the applications for this surveillance did not establish the requisite "necessity" for the proposed intercepts. In addition, Defendant Wren contends that the Government agents who carried out the surveillance failed to comply with the minimization requirements set forth at 18 U.S.C. § 2518(5). For the reasons stated below, as well as those stated on the record at the November 15, 2010 hearing, the Court finds no basis for the suppression of evidence sought by Defendants.

In order to secure judicial authorization for the interception of wire, oral, or electronic communications, an applicant must provide, *inter alia,* a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). "This statutory 'necessity requirement' was designed to insure that 'wiretapping is not resorted to in a situation in which traditional investigative techniques will suffice to expose the crime.'" *United States v. Stewart,* 306 F.3d 295, 304 (6th Cir. 2002) (quoting *United States v. Alfano,* 838 F.2d 158, 163 (6th Cir. 1988)). "Generally, a district court's finding that the requirements of § 2518(1)(c) have been met are afforded considerable discretion." *Stewart,* 306 F.3d at 304 (internal quotation marks and citation omitted).

The Sixth Circuit has emphasized that the requirement of "necessity" imposed under § 2518(1)(c) does not demand that the Government "prove the impossibility of other means of obtaining information." *Stewart,* 306 F.3d at 305. "Nor need a wiretap be used only as a last resort." *United States v. Landmesser,* 553 F.2d 17, 20 (6th Cir. 1977). "Instead, the necessity provisions merely require that law enforcement officials 'give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate.'" *Stewart,* 306 F.3d at 305 (quoting *United States v. Lambert,* 771 F.2d 83, 91 (6th Cir. 1985)). The purpose of § 2518(1)(c) is "not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *Landmesser,* 553 F.2d at 20 (internal quotation marks and citation omitted). "Furthermore, the mere fact that some investigative techniques were successful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance." *Stewart,* 306 F.3d at 305.

Applying these standards here, there is no basis for disturbing the findings of Judges Steeh and Roberts that the requisite showing of "necessity" was made. The wiretap applications at issue were supported by the affidavits of U.S. Drug Enforcement Administration ("DEA") Special Agent Bryan Sartori. In his initial 52-page, 78-

paragraph affidavit, Special Agent Sartori devoted over 25 pages to a detailed summary of the investigative efforts undertaken prior to seeking authorization for a wiretap, including (i) searches of Defendant Cathey's vehicles and residence, (ii) the use of four confidential sources and one cooperating defendant to obtain information about Defendant Cathey's suspected drug trafficking activities, (iii) interviews with Cathey, his girlfriend Michelle McCormick, and others who had dealings with Cathey, (iv) consensually recorded and DEA-supervised calls between Cathey and confidential sources, (v) analysis of telephone records and pen register information for the cell phone that was the target of the wiretap application, and (vi) surveillance of Cathey and other suspected members of his alleged drug trafficking organization. (*See* Gov't Response, Ex. 1, Sartori 1/29/2009 Aff. at ¶¶ 15-52.) These investigative efforts spanned over three years, from mid-2005 until late 2008, shortly before the Government applied for wiretap authorization.

Following this detailed description of the conventional investigative techniques used to date, Special Agent Sartori provided a ten-page, 19-paragraph statement of the basis for his belief that "the interception of wire communications is the only available technique with a reasonable likelihood of identifying the full scope of the above-described conspiracy and securing evidence necessary to prove beyond a reasonable doubt that MICHAEL CATHEY has used, and will continue to use, [the target cell phone] to communicate with other persons involved in the distribution of narcotics and

5

the collection of narcotics-related proceeds." (*Id.* at ¶ 53.) In this statement, Special Agent Sartori referred back to his summary of the investigative efforts to date, and explained why each of these efforts was unlikely to provide a clearer picture of Defendant Cathey's drug organization, including the scope of this enterprise, the sources of supply, and the identities and roles of his accomplices. Specifically, Special Agent Sartori opined (i) that the cooperating sources used to date had not established themselves as trusted members of Cathey's organization, that Cathey had proven unwilling to divulge anything beyond "limited information" to these sources, and that these sources were able to provide only second-hand and historical (as opposed to current) information about Cathey's activities, (*id.* at ¶¶ 57- 60), (ii) that investigators had thus far failed in their efforts to introduce an undercover agent into Cathey's organization, (*id.* at ¶ 61), (iii) that grand jury subpoenas and witness interviews were unlikely to assist the investigation because some of the organization's member were as yet unidentified, witnesses were likely to prove uncooperative, and such efforts would likely alert the members of the organization to the existence of an investigation, (*id.* at ¶¶ 62-63), (iv) that search warrants likewise would alert the subjects of the investigation, and the DEA was presently unaware of any new locations that would be useful to search, (*id.* at ¶¶ 65-66), (v) that pen registers and toll records had proven helpful to date but could not provide "real time" or more detailed information about the subject organization, particularly where Cathey and his accomplices had "employed a practice of changing

6

telephone numbers in an effort to avoid detection by law enforcement," (*id.* at ¶ 67), (vi) that physical surveillance had been tried with some success, but was no longer of use because the DEA could not locate Cathey's current residence, he "continually switches vehicles," and it was believed that his organization stored drugs and proceeds at multiple locations, (*id.* at ¶¶ 68-69), and (vii) that such methods as trash searches and vehicle tracking devices were unlikely to assist the investigation in light of the DEA's lack of knowledge about Cathey's current residence, the locations where his organization stored drugs or proceeds, and the vehicles he was presently using, (*id.* at ¶¶ 70-71). More generally, Special Agent Sartori's affidavit described Cathey's extensive use of cell phones in conducting his drug trafficking activities, (*see, e.g., id.* at ¶¶ 9, 11, 29, 31, 45-46, 50, 51, 52), lending support to his view that the requested wiretap was necessary to ascertain the full scope of the alleged conspiracy and the identities and roles of the members of Cathey's organization.

Special Agent Sartori's statement as to the necessity of the requested interception more than suffices to meet the standards of § 2518(1)(c) as construed by the courts. His affidavit, with its detailed description of the investigative efforts undertaken to date, "established that normal investigative procedures had been extensively conducted, and that the requested interception of . . . communications was not employed as the initial step in [the DEA's] criminal investigation." *United States v. Cooper,* 868 F.2d 1505, 1509 (6th Cir. 1989) (internal quotation marks and citation omitted). Moreover, Special

Agent Sartori provided specific "reasons for [his] belief" that the investigative techniques employed in the past would "likely be inadequate" to learn additional information about Cathey's and his accomplices' alleged drug trafficking activities. *See Stewart,* 306 F.3d at 305. As the Sixth Circuit observed under similar circumstances in *Stewart*:

> We have previously recognized that wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation. The evidence reflects that various members of the drug conspiracy facilitated the criminal enterprise through multiple telephone conversations from several locations. In addition, it does not appear that the government could have uncovered the full scope of the conspiracy, especially not in a relatively safe manner, without the wiretaps. By the time the electronic surveillance began in this case, the investigation had been going on for approximately three years. Yet, the surveillance permitted authorities to discover numerous additional participants in this far-reaching conspiracy.

306 F.3d at 305-06. Likewise, in this case, the Government observes that the wiretap "yielded additional conspirators, namely defendant Wren," and also enabled the investigators to "establish probable cause for search warrants, as well as seize currency, drugs and other evidence." (Gov't Response Br. at 4.)

Defendants argue, however, that Special Agent Sartori's statement of necessity relied on boilerplate language, generalized opinions, and conclusory assertions of the sort held by the courts to be insufficient to satisfy § 2518(1)(c). They note, for example, that this statement included language — *e.g.,* that the confidential sources, even if they were more active or trusted members of Cathey's organization, would be "generally unaware of all the other members of [the] organization and their specific roles within the

organization," (Sartori Aff. at ¶ 60) — that was not specifically linked to the investigation in question, and could equally well have appeared in a wiretap application arising from any drug conspiracy investigation. Yet, the Sixth Circuit has cautioned against such a reading of an individual passage "in isolation from the remainder of the affidavit which was before the [district court] at the time the application was made." *Landmesser,* 553 F.2d at 20. In that case, for example, the court noted that the affidavit as a whole provided "a detailed outline of the activities which led to the application," thereby "furnish[ing] an ample factual background to support the more conclusory allegations" found in individual paragraphs of the affidavit. 553 F.2d at 20-21. Here, too, the portion of Special Agent Sartori's affidavit devoted to a showing of necessity must be read in the context of his accompanying, detailed account of a three-year investigation that employed a number of investigative methods and techniques but still had not uncovered, for example, the source in Chicago from which Cathey allegedly obtained quantities of marijuana. Under this record, the District Judges who authorized the wiretap did not abuse their discretion in concluding that Special Agent Sartori's affidavit made the requisite showing that "law enforcement officials g[a]ve serious consideration" to non-wiretap investigative techniques — and, in fact, employed many such techniques — "prior to applying for wiretap authority," and that this affidavit sufficiently informed the court "of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *Stewart,* 306 F.3d at 305

(internal quotation marks and citation omitted).

Finally, Defendant Wren suggests that the Government failed to comply with the minimization requirements found at 18 U.S.C. § 2518(5). Defendant acknowledges that he bears the "burden of production and persuasion" as to the Government's lack of compliance with the minimization requirements, and that he must make an initial showing sufficient to establish an entitlement to an evidentiary hearing on this matter. *United States v. Giacalone,* 853 F.2d 470, 482 (6th Cir. 1988). While he contends that the Government has yet to provide the information needed to make such a showing, the Government points to the interim reports it prepared each ten days during the surveillance, and it argues that these reports and the other related information produced to Defendant shortly after his arraignment provide a sufficient basis for him to assess the Government's compliance with the minimization requirements. The Government further cites the minimization sections included in its initial and extension applications for wiretap authority, as well as the minimization meeting conducted by the Assistant U.S. Attorney with the law enforcement officers who served as monitors during the surveillance.

At the November 15, 2010 hearing on Defendants' motions, counsel for Defendant Wren was unable to identify anything in the materials provided by the Government that would reflect a lack of compliance with the statutory minimization requirements. Neither did counsel suggest what additional materials would be needed to

determine whether the Government complied with these obligations. Under this record, the Court finds that Defendant Wren has failed to make an initial showing sufficient to warrant an evidentiary hearing on the Government's compliance with the minimization requirements set forth at 18 U.S.C. § 2518(5).[2]

**B.     Defendant Wren's Motion to Suppress Evidence Seized from 137 Allenhurst Avenue in Royal Oak, Michigan**

In a second motion to suppress, Defendant Dajuan Lamarr Wren contends that a May 7, 2009 warrant to search his residence at 137 Allenhurst Avenue in Royal Oak, Michigan was not based on a showing of probable cause, and that the evidence seized in this search therefore should be suppressed. Defendant Wren further argues that the Court should conduct a hearing in accordance with *Franks v. Delaware,* 438 U.S. 154 (1978), so that he can question the agent who prepared the search warrant affidavit, DEA Special Agent Bryan Sartori, about information that he allegedly omitted from his affidavit, and about a statement allegedly made to him by co-defendant Antonio Simmons concerning Defendant Wren's purported drug trafficking activity.

The affidavit in support of the search warrant relied principally on three sources: (i) calls intercepted in early March of 2009 involving Defendants Cathey, Wren, and Simmons, (ii) surveillance of these three individuals, and (iii) Special Agent Sartori's

---

[2]Defendant Wren's counsel indicated at the November 15 hearing that he planned to further review the materials provided by the Government, and he asked for an opportunity to revisit the issue of proper minimization if warranted following this review. Since the hearing, counsel has not indicated to the Court that he wishes to pursue this matter further, and so the Court presumes that no further challenge is forthcoming.

11

April 1, 2009 interview of Defendant Simmons. Apart from challenging the affidavit's reliance on calls that purportedly were intercepted in violation of 18 U.S.C. § 2518,[3] Defendant Wren contends that Special Agent Sartori's affidavit misinterpreted the intercepted calls as providing probable cause to believe that Wren had supplied drugs to Cathey. In addition, Defendant Wren asserts that the affidavit was incomplete and misleading in (i) failing to disclose other calls, statements, and information which would have undercut the inferences advanced in the affidavit, and (ii) failing to provide a factual basis upon which the reviewing Magistrate Judge could have assessed the weight to be given to Defendant Simmons's purported statement to Special Agent Sartori.

Turning first to Defendant's challenge to Special Agent Sartori's interpretation of the wiretapped communications recounted in his affidavit, these communications occurred on March 9 and 11, 2009, accompanied by surveillance of the activities of Defendants Cathey, Wren, and Simmons. In the first set of calls on March 9 (recounted in paragraph 8 of Special Agent Sartori's affidavit), Cathey and Wren discussed a meeting at a specified location. Upon following Cathey's vehicle later that same evening, Special Agent Sartori observed it travel to the agreed-upon location and pull up alongside a white Range Rover believed to be driven by Wren. In a call made just after

---

[3] Defendant Wren (as well as Defendant Cathey) raised this challenge to the intercepts in their separate motions addressed above.

this meeting, Cathey told an associate that he "just got a new plug on some roof roof"[4] and that his "cuz came through today."

Regarding the March 11 calls (recounted in paragraphs 9, 11, and 12 of Special Agent Sartori's affidavit), agents observed Cathey arrive at and enter the Westin Hotel in Southfield, Michigan, and Wren's white Range Rover was also seen parked in the valet parking area of the hotel. A few minutes later, Cathey called Simmons, told Simmons he "got you the big boy first then I'm going to grab you the misc," and arranged to meet Simmons in Detroit. Agents then witnessed Cathey exiting the hotel and traveling to an apartment building on Cass Avenue in Detroit, and Simmons was observed arriving at and entering this same building. Simmons briefly left the building, retrieved a bag from his car, and re-entered the building, with Cathey overheard in an intercepted call from the apartment counting money and saying, "Twenty short." Cathey then arranged to meet Wren on Mark Twain Street, and agents witnessed him leaving the Cass Avenue building with a bag.

Upon traveling to Mark Twain Street, Cathey's vehicle was approached by Wren's vehicle, but Wren immediately sped away. A subsequent stop of Cathey's vehicle revealed $18,000 in currency, and Special Agent Sartori surmised in his affidavit that Cathey was attempting to give this money to Wren as payment for a quantity of heroin

---

[4]Special Agent Sartori opined in his affidavit that "roof roof" is street slang for heroin. However, counsel for Defendant Wren states that in his many years of experience, he has never heard this term prior to this case.

13

when Wren sped away. Later this same night, agents intercepted calls between Cathey and Simmons regarding the stop of Cathey's vehicle and the seizure of currency, and Special Agent Sartori interpreted these calls as reflecting Cathey's and Simmons's belief that Cathey's vehicle was stopped because he had met with an individual (Wren) who was under police investigation.

In Defendant Wren's view, the intercepted calls and surveillance recounted in Special Agent Sartori's affidavit do not support the agent's belief that Wren and Cathey had engaged in a drug transaction, and that the money seized from Cathey was intended as payment to Wren for drugs he had provided to Cathey. Rather, Wren views the intercepted calls as reflecting Cathey's and Simmons's confusion over why Cathey was stopped, and Wren maintains that the two men would not have exhibited any such confusion if they knew that Cathey was stopped while trying to pay Wren for a drug transaction. Yet, regardless of whether one finds Special Agent Sartori's or Defendant Wren's reading of these conversations more plausible, the affidavit need only establish a probability of criminal activity, and the reasonable inferences drawn by a magistrate in reviewing this affidavit are entitled to deference. *See United States v. Davidson,* 936 F.2d 856, 860 (6th Cir. 1991). Moreover, the magistrate permissibly could have concluded that the affidavit, viewed in its totality, disclosed a "pattern of activity consistent with drug trafficking" that would support a finding of probable cause to search Wren's residence. *Davidson,* 936 F.2d at 859 (internal quotation marks and citation

omitted). Finally, to the extent that Defendant Wren argues that other communications and information that were omitted from the affidavit might have led the magistrate to draw a different conclusion, and that a *Franks* hearing is necessary to explore the motives for excluding this additional information from the affidavit, the Government points out that "a *Franks* hearing is only merited in cases of omissions in rare instances." *United States v. Graham,* 275 F.3d 490, 506 (6th Cir. 2001) (internal quotation marks and citation omitted). Nothing in the omissions cited by Defendant remotely suggests a "deliberate or reckless disregard [for] the truth," *Graham,* 275 F.3d at 506, that would warrant further exploration at a hearing.

Defendant Wren next challenges the affidavit's reliance on Special Agent Sartori's April 1, 2009 interview of Defendant Simmons, who purportedly stated that he was summoned to the March 11, 2009 meeting with Cathey at the Cass Avenue apartment building because Cathey wanted him to "mix" or "cut" a quantity of heroin Cathey was to receive from Wren. Defendant Wren contends that a *Franks* hearing is necessary to determine whether the affidavit accurately recounts Simmons's alleged statements during his interview.[5] Wren further faults the affidavit for failing to identify a factual basis for Simmons's personal knowledge regarding any alleged drug transaction between Cathey and Wren, and for failing to suggest why Simmons's statement should be viewed as reliable. In addition, Wren notes that, according to the affidavit, Simmons denied during

---

[5]Defendant Wren concedes that Defendant Simmons is unlikely to be willing to testify at a *Franks* hearing, unless and until he elects to enter a guilty plea.

15

the interview that he had received any heroin from Cathey, and Wren contends that this undercuts any possible inference that Cathey had just received a delivery of narcotics from Wren.

Yet, it is important to observe at the outset that Simmons's denial *was* disclosed in the affidavit, undercutting Defendant Wren's contention that Special Agent Sartori was cherry-picking facts to present to the magistrate. More generally, and as the Government points out, while Defendant faults Special Agent Sartori for failing to present a complete picture upon which the magistrate could make a proper determination of probable cause, Wren has not made the requisite preliminary showing that Special Agent Sartori's affidavit included any "false statement [made] knowingly and intentionally, or with reckless disregard for the truth," such that a *Franks* hearing might be warranted. *Graham,* 275 F.3d at 505 (internal quotation marks and citation omitted). Finally, Simmons's statement as reported by Special Agent Sartori need not be viewed in isolation, but is merely a part of an overall set of facts and circumstances recounted in the affidavit that the magistrate could rely upon in determining that there was probable cause to search Wren's residence. Upon reviewing this affidavit in its totality, the Court finds no basis for disturbing the magistrate's finding of probable cause, nor a basis for ordering a *Franks* hearing.[6]

---

[6]The Court having concluded that Special Agent Sartori's affidavit provided a sufficient basis for the magistrate to find probable cause to believe that Defendant Wren was engaged in drug trafficking, Wren concedes that this finding would be sufficient to justify a search of his residence for contraband or evidence of drug dealing. *See, e.g., United States v. Newton,* 389

16

### III. CONCLUSION

For the reasons stated at the November 15, 2010 hearing, as supplemented by the rulings set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant Michael Lamar Cathey's September 27, 2010 motion to suppress electronic surveillance (docket #90) is DENIED.  IT IS FURTHER ORDERED that Defendant Dajuan Lamarr Wren's September 28, 2010 motion to suppress Title III wire/oral intercepts (docket #91) also is DENIED.  Finally, IT IS FURTHER ORDERED that Defendant Wren's September 28, 2010 motion to suppress evidence seized from 137 Allenhurst Avenue, Royal Oak, Michigan (docket #103) is DENIED.

                                      s/Gerald E. Rosen
                                      Chief Judge, United States District Court

Dated:  December 10, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 10, 2010, by electronic and/or ordinary mail.

                                      s/Ruth A. Gunther
                                      Case Manager

---

F.3d 631, 635-36 (6th Cir. 2004).