# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

                                  Case No. 10-cr-20137

v.

                                  Hon. Laurie J. Michelson

DAJUAN LAMARR WREN,

                                  **Oral Argument Requested**

      Defendant.

---

Julie A. Beck (P53291)
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9717
julie.beck@usdoj.gov
*Attorneys for the United States*

Wade G. Fink (P78751)
WADE FINK LAW PC
370 E. Maple Rd., Third Floor
Birmingham, Michigan 48009
(248) 712-1054
wade@wadefinklaw.com
*Attorneys for DaJuan Wren*

---

## EMERGENCY MOTION FOR COMPASSIONATE RELEASE

Defendant Da'Juan Wren ("Wren"), through counsel, WADE FINK LAW, P.C., moves this Court for an order reducing his sentence and releasing him from prison under the compassionate release provisions of 18 U.S.C. § 3582, as modified by the First Step Act. FCI Elkton, where Wren is currently housed, **accounts for 10.1% of all confirmed cases in the Bureau of Prisons**. This is an absolute emergency.

Pursuant to Local Rule 7.1, the undersigned sought concurrence on this motion on July 23, 2020, which went unanswered.

Given the emergency nature of the situation at FCI Elkton as compared to other facilities, Wren asks this Court to order a response from the government within five (5) days.

Date:  July 23, 2020                    Respectfully Submitted,

                                        WADE FINK LAW P.C.

                                        /s/ Wade G. Fink
                                        Wade G. Fink (P78751)
                                        *Attorneys for Defendants*
                                        370 E. Maple Rd., Third Floor
                                        Birmingham, MI 48009
                                        248-712-1054
                                        wade@wadefinklaw.com

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

                                     Case No. 10-cr-20137

v.

                                   Hon. Laurie J. Michelson

DAJUAN LAMARR WREN,

                               **Oral Argument Requested**

     Defendant.

---

Julie A. Beck (P53291)
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9717
julie.beck@usdoj.gov
*Attorneys for the United States*

Wade G. Fink (P78751)
WADE FINK LAW PC
370 E. Maple Rd., Third Floor
Birmingham, Michigan 48009
(248) 712-1054
wade@wadefinklaw.com
*Attorneys for DaJuan Wren*

---

## BRIEF IN SUPPORT OF EMERGENCY MOTION FOR COMPASSIONATE RELEASE

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES**……………………………………………………iii

**STATEMENT OF ISSUES**………………………………….………...….…v

**I.    INTRODUCTION AND FACTUAL BACKGROUND**…….….…..……..1

**II.    ARGUMENT**………………………………………....…………..………3

A. THE   PRISON   SETTING   COMBINED   WITH   WREN'S UNDERLYING    HEALTH    CONDITIONS    CONSTITUTE    A COMPELLING    AND    EXTRAORDINARY    CIRCUMSTANCE WARRANTING RELEASE……………………………....………...3

    1. Wren's Underlying Health Conditions……………………………5

    2. Prisons Are "Tinder Boxes For Infectious Disease"……………...13

    3. A Sentence Reduction Is Also Consistent With The Sentencing Commission's Policy Statements And The Factors Outlined In § 3553(a)…………………………….………………………………19

        a. *Policy Statements*……………………………………………19

        b. *3553(a) Factors*………………………………………….....20

B. ALTERNATIVELY, THIS COURT SHOULD PERMIT WREN TO COMPLETE HIS SENTENCE IN HOME CONFINEMENT………23

**III.    CONCLUSION**…………………………………………………….…...24

# TABLE OF AUTHORITIES

## Cases

*Tubbs-Smith v. United States*, No. 18-20310, 2020 U.S. Dist. LEXIS 116626 (E.D. Mich. July 2, 2020) ……………………………………………….………….10

*United States v. Alam*, No. 20-1298, 2020 U.S. App. LEXIS 17321 (6th Cir. June 2, 2020) ……………………………………………….………………………4

*United States v. Aguayo*, No. 19-cr-02610-BAS-1, 2020 U.S. Dist. LEXIS 121959 (S.D. Cal. July 10, 2020) …………………………………………….……18

*United States v. Bass*, No. 1:10-CR-166 (LEK), 2020 U.S. Dist. LEXIS 102543, 2020 WL 2831851 (N.D.N.Y. May 27, 2020) ……………………………………..6

*United States v. Burnside*, No. 18-CR-2068- CJW-MAR, 2020 U.S. Dist. LEXIS 112708 (N.D. Iowa June 18, 2020) …………………………………………..15

*United States v. Butler* No. 18 Cr. 834 (PAE), Dkt. 461, 2020 U.S. Dist. LEXIS 61021 (S.D.N.Y. Apr. 7, 2020) …………………………………………………23

*United States v. Cassidy*, No. 17-CR-116S, 2020 U.S. Dist. LEXIS 84692 (W.D.N.Y. May 13, 2020) …………………………………………………….……5

*United States v. Credidio*, No. 19 Cr. 111 (PAE), Dkt. 62, 2020 U.S. Dist. LEXIS 58238 (S.D.N.Y. April 2, 2020) …………………………………………..22

*United States v. Dawson*, No. 18-40085-HLT, 2020 U.S. Dist. LEXIS 64383 (D. Kan. Apr. 9, 2020) ……………………………………………….……….14

*United States v. DeBartolo*, No. 14-016 WES, 2020 U.S. Dist. LEXIS 102335 (D.R.I. June 10, 2020) …………………………………………………….………16

*United States v. Delgado*, No. 3:18-cr-17-(VAB)-1, 2020 U.S. Dist. LEXIS 84469 (D. Conn. Apr. 30, 2020) …………………………………………….……14

*United States v. Facen*, No. 11-CR-6177L, 2020 U.S. Dist. LEXIS 115136 (W.D.N.Y. July 1, 2020) …………………………………………….…….9

*United States v. Field*, No. 18-CR-426 (JPO), 2020 U.S. Dist. LEXIS 78112 (S.D.N.Y. May 4, 2020) …………………………………………………….……17

*United States v. Goins*, No. 11-cr-20376, 2020 U.S. Dist. LEXIS 100358 (E.D. Mich. June 9, 2020) ……………………………………………………….……………..17

*United States v. Jackson*, No. 2:18-cr-86-PPS, 2020 U.S. Dist. LEXIS 108255 (N.D. Ind. June 19, 2020) ……………………………………………….…………..9

*United States v. Lacy*, No. 15-CR-30038, 2020 WL 2093363 (C.D. Ill. May 1, 2020) 1………………………………………………….……...4

*United States v. Ladson*, No. 04-697-1, 2020 U.S. Dist. LEXIS 108551 (E.D. Pa. June 22, 2020) ……………………………………………….………………16

*United States v. Martin*, No. 18-CR-834-7 (PAE), 2020 U.S. Dist. LEXIS 63451 (S.D.N.Y. Apr. 10, 2020) …………………………………………………….…...12

*United States v. McBride*, No. 17-CR-192-FPG, 2020 U.S. Dist. LEXIS 114478 (W.D.N.Y. June 29, 2020) …………………………………………….……10

*United States v. Pomante*, No. 19-20316, 2020 U.S. Dist. LEXIS 85626 (E.D. Mich. May 15, 2020) ……………………………………………….………………23

*United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 U.S. Dist. LEXIS 58718 (E.D. Pa. Apr. 1, 2020) …………………………………………………….………5

*United States v. Salvagno*, No. 5:02-CR-51 (LEK), 2020 U.S. Dist. LEXIS 109879 (N.D.N.Y. June 22, 2020) …………………………………………………..16

*United States v. Sawicz*, No. 08-cr-287 (ARR), 2020 U.S. Dist. LEXIS 64418 (E.D.N.Y. Apr. 10, 2020) …………………………………………………….…...17

*United States v. Shah*, No. 93-cr-180 (LAK), 2020 U.S. Dist. LEXIS 115188 (S.D.N.Y. June 30, 2020) ………………………………………………….…...18

*United States v. Tranter*, No. 1:17-CR-22-HAB, 2020 U.S. Dist. LEXIS 119224 (N.D. Ind. July 8, 2020) …………………………………………………….…..10

*United States v. Vo Duong Tran*, No. CR 08-00197-DOC, 2020 U.S. Dist. LEXIS 65414 (C.D. Cal. Apr. 10, 2020) …………………………………………………..12

*United States v. White*, No. 2:17-cr-00198-4, 2020 U.S. Dist. LEXIS 103974 (S.D. W. Va. June 12, 2020) ……………………………………………….………..9

*Wilson v. Williams*, No. 4:20-cv-00794, 2020 U.S. Dist. LEXIS 70674 (N.D. Ohio Apr. 22, 2020) ……………………………………………….………………..9

*Wilson v. Williams*, No. 20-3447, 2020 U.S. App. LEXIS 18087, at *20-21 (6th Cir. June 9, 2020) ………………………………………………….………………9

## **Statutes and Rules**

18 U.S.C. § 3582……………………………………………….…………*passim*

18 U.S.C. § 922(g)………………………………………………………...1

21 U.S.C. § 841(a)(1)……………………………………….………...1

21 U.S.C. §§ 846……………………………………………….…………1

U.S.S.G. § 1B1.13……………………………………………………...19

## <u>STATEMENT OF ISSUES</u>

1.    Has Wren demonstrated a compelling and extraordinary circumstance warranting compassionate release in light of his obesity, recent test results showing hypertension and pre-diabetes, and the particularly dangerous situation at FCI Elkton, all of which heighten his risk of developing life-threatening complications should he contract COVID-19?

Defendant answers, yes.

2.    Has Wren demonstrated that a reduction in sentence would be consistent with Section 3353(a) factors and policy statements issued by the Sentencing Commission, which require the Court to consider Wren's danger to society and other elements, when Wren has avoided any major disciplinary infractions while incarcerated?

Defendant answers, yes.

## I.   INTRODUCTION AND FACTUAL BACKGROUND

On March 25, 2010, Da'Juan Wren was indicted for federal drug and firearm charges stemming from the DEA's investigation of Michael Cathey's drug organization. Four years into the investigation, a wiretap placed on co-defendant Cathey's phone implicated Wren in the organization and resulted in the execution of several search warrants. Law enforcement seized 755 grams of heroin from the home of Wren's co-defendant's girlfriend. The government alleges that drug paraphernalia, drug ledgers, and ammunition were also seized from Wren's home and a firearm was recovered in Wren's car, parked in his garage.

Wren was subsequently charged with conspiracy to possess with intent to distribute and to distribute heroin and marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1), and felon in possession of a firearm and ammunition contrary to 18 U.S.C. § 922(g). At trial, Wren disputed his ownership of the gun, the nature of the drug ledger, and his connection to Cathey's heroin. Wren's girlfriend, Crystal Ogen, testified that she was in fact the owner of the firearm located in Wren's car. Additionally, Wren asserted that the purported drug ledger was actually documenting transactions for his recording studio business.

A jury convicted Wren on both counts. Wren was sentenced to 216 months on count one and 120 months on count eight, to be served concurrently. ECF No. 323, PageID.3403. However, Wren's sentence was ultimately lowered from 216 months

to 188 months following an amendment to the Sentencing guidelines which reduced his base offense level by two levels. With an out date of May 3, 2025, Wren has served approximately 70% of his sentence to date.[1]

Wren, however, urges this court to reduce the remaining 30% of his sentence because of the COVID-19 pandemic. Wren is 43 years old, severely obese, and is showing signs of hypertension and prediabetes. Because of his underlying health conditions, Wren is at high risk for developing catastrophic health consequences should he contract COVID-19.  The emergency nature of Wren's request is also amplified by the virus' infection rate within FCI Elkton, where Wren is currently serving his sentence.

FCI Elkton has been identified as one of the epicenters of the COVID-19 within the BOP. Despite months of lockdown, the facility still ranks among the most infected across BOP prisons nationwide for both reported cases of COVID-19 and morality rate. In fact, FCI Elkton has confirmed 1061 cases of COVID-19 between inmates and staff and 9 inmate deaths. Despite a staggering level of infection, inmates who have tested negative for the virus are still being exposed and commingled with inmates who tested positive. The BOP's actions during the pandemic have become so egregious and unsafe that the Union representing BOP

---

[1] Wren only has 57 months, or 30%, of his 188 month sentence remaining.

staff members across the county filed an Imminent Danger complaint with the Occupational Safety and Health Administration, discussed herein.

Wren now files this motion for his compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). This Court should grant such relief for the following reasons: first, Wren has satisfied the exhaustion requirement contained in Section 3582. Second, Wren asserts that the global health crisis, in combination with his underlying health conditions, constitutes compelling and extraordinary circumstances warranting his compassionate release because the conditions render him especially vulnerable to developing a severe case of COVID-19. Third, a reduction in Wren's sentence would not be contrary to the factors outlined in Section 3553(a) and would be consistent with the Sentencing Commission's policy statements.

In the alternative, Wren asks that this court allow him to serve out the remaining 57 months of his sentence in home confinement or on similar supervised release conditions.

## II.   <u>ARGUMENT</u>

### A.   THE PRISON SETTING COMBINED WITH WREN'S UNDERLYING HEALTH CONDITIONS CONSTITUTES A COMPELLING AND EXTRAORDINARY CIRCUMSTANCE WARRANTING RELEASE.

18 U.S.C. § 3582, as amended by the First Step Act, provides that a defendant must "fully exhaust [] all administrative rights" or otherwise "wait for 30 days after

the warden's receipt of [their] request." *United States v. Alam*, No. 20-1298, 2020 U.S. App. LEXIS 17321, at *5 (6th Cir. June 2, 2020). [2]

Wren has exhausted his administrative requirements. On April 6, 2020, Wren sent an email to the Warden of FCI Elkton requesting "early release and/or home confinement." **Exhibit A**, Compassionate Release Request. In the petition Wren also expressed concern for his health, stating "[p]eople have been dropping like flies around here and daily more people are falling ill. I don't want to die in here from [coronavirus] Sir." *Id.* Wren similarly stated that should he be released, he has "a home to go to, [and] family and employment waiting." *Id.*

Wren's request, however, was denied by the BOP on May 7, 2020. The denial stated that BOP health services staff had reviewed Wren's medical records but concluded that he did not meet the criteria for a compassionate release. Wren subsequently appealed the denial to the region on May 15, 2020 by certified mail but has yet to receive a decision. Despite not hearing from the region regarding his appeal, Wren has satisfied the exhaustion requirement as 30 days have passed since he submitted his compassionate release request. *See Alam*, 2020 U.S. App. Lexis 17321, at *7 ("Prisoners who seek compassionate release have the option to take their claim to federal court within 30 days, no matter the appeals available to them.").

---

[2] All unpublished cases attached as **Exhibit F.**

Having exhausted, Section 3582 next instructs a court considering compassionate release to determine "whether extraordinary and compelling reasons exist for a sentence reduction" and whether "a sentence reduction is consistent with the applicable Sentencing Guidelines provisions." *United States v. Cassidy*, No. 17-CR-116S, 2020 U.S. Dist. LEXIS 84692, at *4 (W.D.N.Y. May 13, 2020) (quoting § 3582(c)(1)(A)). Wren submits that his underlying health conditions, in light of the extreme ease of transmission of COVID-19 within FCI Elkton, constitutes an extraordinary and compelling circumstance. Wren also submits that his release would be consistent with the Sentencing Guidelines.

## 1.    Prisons Are "Tinder Boxes For Infectious Disease"[3]

Wren is being housed at FCI Elkton, a prison which is currently reporting the sixth largest outbreak of COVID-19 across the BOP. In fact, the 174 active cases of the virus at FCI Elkton accounts for 4% of the BOP's infected inmates.[4] Furthermore, the BOP reports that since it began testing, 1000 inmates within FCI Elkton have tested positive for COVID-19 – meaning that to date 45% of the prison population at the facility has contracted the virus.[5] Furthermore, Ohio, the state

---

[3] *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 U.S. Dist. LEXIS 58718, at *2 (E.D. Pa. Apr. 1, 2020).

[4] COVID-19 Cases, https://www.bop.gov/coronavirus/

[5] FCI Elkton currently houses 2,212 inmates. https://www.bop.gov/locations/institutions/elk/

which FCI Elton is located in, is experiencing an exponential increase in COVID-19 cases, recently reporting the second largest single day spike in hospitalizations since the pandemic started.[6] Although Wren has tested negative twice to date, the continued and growing presence of COVID-19 within the state of Ohio and FCI Elton still places Wren in palpable danger.

It is not surprising that COVID-19 has spread like wild fire within FCI Elton given that correctional settings inherently prevent inmates from protecting themselves from infectious disease like COVID-19 because of prison living conditions. Although BOP facilities have been on lockdown for months to try to combat the unique challenges prisons are facing, inmates still remain in close proximity to each other, unable to practice social distancing, and share the same ventilation system, phones, showers, computers, and so on without any sanitation. All it takes is one sneeze, cough, or breath from an infected inmate to release respiratory droplets containing infections particles into the ventilation system or on to any surface. Accordingly, both the CDC and courts within this district have emphasized the heightened dangers inmates face due to their living situation.[7]

---

[6] *Coronavirus in Ohio: Hospitalizations Spike to Second-Highest Total of Pandemic*, https://www.cincinnati.com/story/news/2020/07/20/coronavirus-ohio-hospitalizations-spike-second-highest-total-pandemic/5473857002/

[7] *United States v. Bass*, No. 1:10-CR-166 (LEK), 2020 U.S. Dist. LEXIS 102543, 2020 WL 2831851, at *1 (N.D.N.Y. May 27, 2020) ("FCI Elton has

To make matters worse, Wren reports that staff at FCI Elkton are actively and continuously moving inmates known to be positive with COVID-19 and their property throughout the prison with no sanitization or regard to the population who has yet to contract the virus. For instance, in early May, Wren was instructed by BOP staff to pack his former cellmate's property. Staff had previously been notified that the former cellmate had tested positive for COVID-19, but did not notify Wren of the same and directed him to touch things while another inmate moved into the cell – all of which was done without cleaning the possibly contaminated cell.

Similarly, Wren reports that in late May he was approached by a different inmate who told him that he would be moving into his cell in Unit CA because he had tested positive. Understandably concerned, Wren spoke with staff members who then instructed him to move into a cell in Unit CB on the opposite of the building where the inmates who had tested negative were being housed. However, Wren later discovered that his new cell in Unit CB was the same cell that the positive inmate

---

endured an outbreak of COVID-19 that has been exacerbated by features of the prison's internal architecture that inhibit social distancing"); *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, CDC (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html ("Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced").

had occupied prior to moving. Neither cell was disinfected by staff before either Wren or the other inmate were transferred.

Wren also described an incident last month in June where an inmate, who was also being housed in Unit CB like Wren, was called into an office by staff where he was told that he had tested positive for COVID-19. Instead of immediately quarantining the inmate, the inmate was told to return to Unit CB where he remained for at least 45 minutes before he started transporting his things from his old cell to the new cell within the quarantined unit – even walking past Wren as he was communicating with the undersigned on the computer. At least one other inmate has described similar events to another court. *United States v. Jackson*, No. 2:18-cr-86-PPS, 2020 U.S. Dist. LEXIS 108255, at *7-8 (N.D. Ind. June 19, 2020) ("despite the fact [the defendant] is in a dormitory at FCI Elkton for inmates who have not contracted COVID-19, multiple inmates who initially tested negative were in fact positive and have since been transferred out of the unit").

Wren reports that the situation has worsened in July. A fellow inmate housed across from Wren was recently re-tested for COVID-19 and his results showed that he was positive. However, this came as no surprise to Wren who recounted the same inmate previously testing positive and not being removed from the so called negative cell block despite his test results.

Courts across the country have taken notice of the particularly egregious conditions at FCI Elkton, even prompting Judge Gwin of the Northern District of Ohio to issue a preliminary injunction requiring the BOP to evaluate a subclass of inmates at the facility who were particularly vulnerable to serious illness for compassionate release or transfer. *Wilson v. Williams*, No. 4:20-cv-00794, 2020 U.S. Dist. LEXIS 70674, at *26 (N.D. Ohio Apr. 22, 2020). Although the Sixth Circuit ultimately vacated the preliminary injunction, the Court noted that the inmates had established "a substantial risk of serious harm" due to the conditions of their incarceration, namely "[t]he transmissibility of the COVID-19 virus in conjunction with Elkton's dormitory-style housing—which places inmates within feet of each other." *Wilson v. Williams*, No. 20-3447, 2020 U.S. App. LEXIS 18087, at *20-21 (6th Cir. June 9, 2020). In its opinion, the Sixth Circuit also characterized FCI Elkton as an "epicenter of the pandemic within the federal prison system" and stated that "[e]ach day spent in detention at FCI Elkton increases the threat to the inmates' health and life." *Id.* at *35, 45. District Courts have similarly commented on the perilous conditions at FCI Elkton.[8]

---

[8] *Jackson*, 2020 U.S. Dist. LEXIS 108255 at *6 ("while it is true that these numbers change daily, and the numbers may have improved by now, the spread of COVID-19 remains a very big problem at FCI Elkton"); *United States v. White*, No. 2:17-cr-00198-4, 2020 U.S. Dist. LEXIS 103974, at *12 (S.D. W. Va. June 12, 2020) ("the BOP is to be commended for the steps they have taken to control the virus, but the exponential growth of the virus and the deaths of inmates clearly demonstrates that their steps are not enough"); *United States v. Facen*, No. 11-CR-

FCI Elkton, however, is apparently not the only facility operating under dangerous practices, with the Union representing BOP guards across the country filing an Imminent Danger complaint with the Occupational Safety and Health Administration ("OSHA"). **Exhibit B**, OSHA Complaint. The complaint alleges that staff, including those working at FCI Elkton, have not been allowed to properly self-quarantine after coming into contact with inmates suspected of having COVID-19, have not been provided the proper personal protection equipment, and have even been called back to work after being sent home for possible exposure. *Id.* The complaint concludes that "[BOP's] actions described herein are proliferating the spread of a known and deadly contagion both within our prison system and to our surrounding communities. The agency's actions and inactions are expected to result in death and severe health complications and/or possible life-long disabilities." *Id.*

---

6177L, 2020 U.S. Dist. LEXIS 115136, at *3-4 (W.D.N.Y. July 1, 2020) (noting that "FCI Elkton is one of the worst BOP facilities concerning the virus and its spread"); *Tubbs-Smith v. United States*, No. 18-20310, 2020 U.S. Dist. LEXIS 116626, at *7 (E.D. Mich. July 2, 2020) ("FCI Elkton's COVID-19 cases have been consistently high since the start of the outbreak"); *United States v. Tranter*, No. 1:17-CR-22-HAB, 2020 U.S. Dist. LEXIS 119224, at *10 (N.D. Ind. July 8, 2020) ("Certainly, FCI Elkton finds itself on the end of the COVID-19 containment spectrum that weighs in favor of release"); *United States v. McBride*, No. 17-CR-192-FPG, 2020 U.S. Dist. LEXIS 114478, at *5 (W.D.N.Y. June 29, 2020) ("The Court harbors no doubt that the situation at FCI Elkton was dire. The BOP's failure to control the initial spread of COVID-19 at FCI Elkton has been well documented").

The dire warnings contained in the OSHA complaint were, unfortunately, a prediction of the future, as 98 inmates within the Bureau's custody have tragically lost their lives to date.[9] It appears that nothing has changed with FCI Elkton since the OSHA complaint was filed either. Wren reports that staff are not actively asking inmates if they are experiencing symptoms, and only some officers are wearing masks. Wren also reports that staff at FCI Elkton are now actively refusing to see or treat inmates. This is especially alarming to Wren because his fellow inmate and friend Alvin Turner tragically passed away from COVID-19 at FCI Elkton after his complaints were ignored by staff.[10] Indifference to prisoners seems to emanate from high level staff members at FCI Elkton as well. The Warden made a representation to a federal judge that an inmate within the facility had died of natural causes, **Exhibit C**, Brookwalter Letter, only for the BOP to issue a press release the same day stating that the inmate actually died after testing positive for COVID-19 a month prior.[11]

---

[9] *See* COVID-19 Cases, *supra* note 4.

[10] *Inmate Death at FCI Elkton* (Turner), https://www.bop.gov/resources/news/pdfs/20200414_press_release_elkton.pdf

[11] *Inmate Death at FCI Elkton* (Brookwalter), https://www.bop.gov/resources/news/pdfs/20200509_pres_rel_elk.pdf

The precautionary measures that FCI Elkton is taking also appear to be ineffective. The prison has been on lockdown for over three months in an attempt to slow the transmission of the virus. However, as previously noted, a lockdown alone will most likely not prevent the spread of COVID-19 even if inmates are housed in individual cells – because they "typically share the same ventilation system with prisoners in other cells."[12] The OSHA complaint also commented on this issue, stating that the BOP has "not implemented engineering controls such as high efficiency air filters or air scrubbers to minimize the airborne nature of this virus or otherwise improved the ventilation rates in the environment." **Ex. B**. The ineffectiveness of lockdowns is demonstrated by the fact that almost 10,000 inmates have contracted COVID-19 even with the BOP implementing a facility wide lockdown for the past three months.

In short, despite BOP efforts, the bottom line is that "individuals housed within our prison systems nonetheless remain particularly vulnerable to infection." *United States v. Vo Duong Tran*, No. CR 08-00197-DOC, 2020 U.S. Dist. LEXIS 65414, at *5-6 (C.D. Cal. Apr. 10, 2020). *See also United States v. Martin*, No. 18-CR-834-7 (PAE), 2020 U.S. Dist. LEXIS 63451, at *7 (S.D.N.Y. Apr. 10, 2020) ("The crowded nature of federal detention centers . . . present an outsize risk that the

---

[12] *See* Congressional Research Service, *Federal Prisoners and COVID-19: Background and Authorities to Grant Release* at 1. https://crsreports.congress.gov/product/pdf/R/R46297.

COVID-19 contagion, once it gains entry, will spread."). With the lackluster efforts taken by FCI Elkton to contain COVID-19, it is a very real possibility that Wren's remaining 57 months of incarceration may be transformed into a death sentence.

### 2.    Wren's Underlying Health Conditions

Wren is more at risk than the general population at FCI Elkton for catastrophic health consequences should he contract COVID-19. Wren is an obese 43-year old and was notified by BOP medical staff that recent lab tests now suggest that he is prediabetic and hypertensive. Each of these three underlying conditions will be addressed in turn. All heighten Wren's vulnerability to developing a severe case of COVID-19 on their own and are even more frightening in light of the rampant spread of the virus within FCI Elkton.

First, the CDC explicitly recognizes that people with a BMI over 30 are at high-risk for severe illness from COVID-19.[13] Though the CDC previously only recognized a BMI of 40 or greater as increasing risk, updated guidance recently issued by the CDC lowered that threshold to include those with a BMI of 30 or greater.[14] With an estimated BMI of 44 kg/m2, Wren would have been recognized

---

[13] *People Who Are At Higher Risk*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

[14] *CDC Updates, Expands List of People at Risk of Severe COVID-19 Illness*, (Jun. 25, 2020), https://www.cdc.gov/media/releases/2020/p0625-update-expands-covid-19.html

by the CDC as an individual with increased risk even before the revised guidelines were published.[15] One study, based on COVID-19 patients in the United Kingdom, found that "obese patients were 37% more likely to die in-hospital than non-obese patients" while another study, based on data from Chinese hospitals, concluded that "patients identified as obese has a 142% higher risk of developing severe pneumonia compared with non-obese patients."[16] Wren, therefore, is more vulnerable to catastrophic health consequences just because of his weight.[17]

Second, on May 26, 2020, upon information and belief, Nurse Reignhardt took Wren's vitals and blood sugar. She subsequently informed Wren that his results

---

[15] At 5'7" and 281 pounds, the CDC's BMI Calculator estimates Wren's BMI to be 44. *Adult BMI Calculator*, https://www.cdc.gov/healthyweight/ assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html

[16] British Journal of Anesthesia, *Potential Pathophysiology of COVID-19 in Patients With Obesity*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7275979/

[17] *Obesity & COVID-19: Can Your Weight Alone Put You at Higher Risk? https://www.houstonmethodist.org/blog/articles/2020/jun/obesity-and-covid-19-can-your-weight-alone-put-you-at-higher-risk/* ("People may not realize this, but obesity in and of itself is a risk factor for being hospitalized or placed in the ICU as a result of COVID-19" said weight loss surgeon Dr. Kyle Stephens); *United States v. Dawson*, No. 18-40085-HLT, 2020 U.S. Dist. LEXIS 64383, at *7 (D. Kan. Apr. 9, 2020) (granting compassionate release based on solely an individual's obesity and sleep apnea); *United States v. Delgado*, No. 3:18-cr-17-(VAB)-1, 2020 U.S. Dist. LEXIS 84469, at *7 (D. Conn. Apr. 30, 2020) (same); *United States v. Lacy*, No. 15-CR-30038, 2020 WL 2093363, at *6 (C.D. Ill. May 1, 2020) ("Besides obesity, Defendant suffers from hypertension and diabetes, both of which he manages with medication. **Any one of these three factors alone would increase the serious risks of COVID-19 for Defendant**") (emphasis added)).

14

were trending towards hypertension and prediabetes. Nurse Reignhardt also provided Wren with a hand written note of his results, which, upon information and belief, listed his blood pressure readings as 143/84 and 134/79 and his blood sugar at 123.

The American Diabetes Association lists a blood sugar greater than 100 and less than 125mg/dl as prediabetic, with anything higher than 125mg/dl qualifying as diabetic. With a result of 123mg/dl, Wren appears to be not only prediabetic, but flirting with full blown diabetes. Although the CDC does not explicitly recognize prediabetes as a risk factor which increases risk for serious complications, medical experts have noted that high blood sugar levels can still render an individual's body more easily infiltrated by COVID-19.[18] Consequently, Wren is at risk because of his recent test results suggesting he is now prediabetic. *United States v. Burnside*, No. 18-CR-2068- CJW-MAR, 2020 U.S. Dist. LEXIS 112708, at *23 (N.D. Iowa June

---

[18] *See Blood Sugar Levels May Influence Vulnerability to Coronavirus, and Controlling Them Through Conventional Means Might Be Protective,* https://inside.upmc.com/blood-sugar-levels-may-influence-vulnerability-to-coronavirus-and-controlling-them-through-conventional-means-might-be-protective/ ("when I [Adam Brufsky, M.D., PhD] talked to physicians around the country taking care of COVID-19 patients, they told me that a lot of their patients in the hospital not only had diabetes **and prediabetes** but others had high blood sugar, without being aware of it."); *Hyperglycemia, Hydroxychloroquine, and the COVID-19 Pandemic,* Journal of Medical Virology, https://onlinelibrary.wiley.com/doi/full/10.1002/jmv.25887.

18, 2020) (noting that an inmate "appeared to fit at least three of the [CDC's People at Higher Risk] categories" because he was, among other things, prediabetic); *See also United States v. Ladson*, No. 04-697-1, 2020 U.S. Dist. LEXIS 108551, at *14-15 (E.D. Pa. June 22, 2020) (explaining how poor blood sugar control can impair the immune system).

Furthermore, Wren's May blood pressure readings of 143/84 and 134/79 constitute stage 1 hypertension and elevated blood pressure, respectively.[19] According to the CDC's updated guidance, these recent readings heighten Wren's risk for severe illness should he contract COVID-19 as the condition is now recognized as one which increases risk. Individuals who contracted COVID-19 and also suffered from hypertension had a mortality rate of 6%, compared to the 0.9% fatality rate for persons with no known underlying health issues.[20] Many district courts have accordingly granted compassionate release to those with hypertension.[21]

---

[19] Mayo Clinic, *Blood Pressure Chart: What Your Reading Means*, https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/blood-pressure/art-20050982

[20] *See Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, CDC (Jun. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html

[21] *See United States v. Salvagno*, No. 5:02-CR-51 (LEK), 2020 U.S. Dist. LEXIS 109879, at *35 (N.D.N.Y. June 22, 2020) (denying the government's motion for consideration "based on the well-established correlation between hypertension and severe manifestations of COVID-19, and the substantial

Although Wren's medical records may not reflect an explicit hypertension or prediabetes diagnosis yet, both conditions have likely been compounded by Wren's inability to maintain an exercise regime due to the months long lockdown.[22] Furthermore, district courts have found just one underlying health condition as sufficient to warrant compassionate release where the inmate was housed in an "unusually high risk-facility." *Salvagno*, 2020 U.S. Dist. LEXIS 109879 at *58-59 (collecting cases). In fact, some of the inmates who have been released from highly infected facilities did not even suffer from conditions recognized by the CDC at the time of release, instead they had hypertension or clinical obesity, which the CDC only just formally recognized as risk factors.[23] The government itself has also

---

chorus of experts who have found that there is a causal relationship"); *United States v. DeBartolo*, No. 14-016 WES, 2020 U.S. Dist. LEXIS 102335, at *3 (D.R.I. June 10, 2020) (noting that while "research regarding [hypertension] is also emerging and while the picture . . . is not yet clear, at least one recent study suggests hypertension increases the relative risk of mortality two-fold for a patient hospitalized with COVID-19, as compared with those without hypertension") (citing Chao Gao, et al., *Association of Hypertension and Antihypertensive Treatment with COVID-19 Mortality: A Retrospective Observational Study,* 41 European Heart J. 2058-66, (June 4, 2020), https://academic.oup.com/eurheartj/article/41/22/2058/5851436).

[21] In the month since Wren has retained the undersigned, he has gained 8 pounds alone.

[23] *See United States v. Goins*, No. 11-cr-20376, 2020 U.S. Dist. LEXIS 100358 (E.D. Mich. June 9, 2020) (granting compassionate release to an inmate at FCI Elkton, a facility recognized by Attorney General Barr as experiencing significant levels of infection, who only had hypertension); *United States v. Field*, No. 18-CR-426 (JPO), 2020 U.S. Dist. LEXIS 78112 (S.D.N.Y. May 4, 2020) (granting same to an inmate complaining solely of hypertension at FIC Danbury, a

conceded, multiple times, that obesity alone constitutes extraordinary and compelling reasons for a sentence reduction – even in one case where the inmate was housed at a BOP facility with only one confirmed case of COVID-19.[24] Consequently, Wren's severe obesity alone presents extraordinary and compelling reasons for his compassionate release when viewed in light of the exceptionally grave circumstances at FCI Elkton.

In sum, Wren is at a heightened risk for developing catastrophic health consequences should he contract COVID-19 because of his obesity and recent test results suggesting hypertension and prediabetes. Such conditions, therefore, when viewed in light of the high probability that Wren will be exposed to COVID-19, which is lurking in FCI Elkton, constitute compelling and extraordinary reasons warranting his compassionate release.

---

facility similarly identified by AG Barr as a site of significant infection); *United States v. Sawicz*, No. 08-cr-287 (ARR), 2020 U.S. Dist. LEXIS 64418 (E.D.N.Y. Apr. 10, 2020) (also reducing the sentence of a hypertensive inmate at FCI Danbury).

[24] *United States v. Aguayo*, No. 19-cr-02610-BAS-1, 2020 U.S. Dist. LEXIS 121959, at *4 (S.D. Cal. July 10, 2020) ("The Government concedes that Defendant [who only claimed increased risk due to obesity and resides at FCI Sheridan] has shown 'extraordinary and compelling reasons' for the reduction"); *United States v. Shah*, No. 93-cr-180 (LAK), 2020 U.S. Dist. LEXIS 115188, at *3 (S.D.N.Y. June 30, 2020) ("The government concedes that defendant's obesity constitutes an' extraordinary and compelling reason[]' warranting his early release").

### 3.    A Sentence Reduction Is Also Consistent With The Sentencing Commission's Policy Statements And The Factors Outlined In § 3553(a).

In addition to finding a compelling and extraordinary circumstance warranting compassionate relief, a court considering a defendant's motion under Section 3582(c)(1)(A) must decide whether a sentence reduction would "be consistent with the applicable policy statements issued by the Sentencing Commission" and supported by the "factors set forth in section 3553(a)." § 3582(c)(1)(A).

#### a.    *Policy Statements*

Section 3582(c)(1)(A) is accompanied by a policy statement and commentary promulgated by the Sentencing Commission. The relevant section states that a court may reduce a sentence for "extraordinary and compelling reasons," including situations, among others, where an individual is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13(1)(A).

For the reasons discussed *infra*, Wren is at an increased risk for developing life-threatening conditions should he contract COVID-19. Should Wren become infected with COVID-19 and develop severe complications, he will certainly have a difficult time caring for himself, and may even die while fighting the virus. Thus,

Wren urges this Court to find that there are extraordinary or compelling reasons favoring his early release. *Sawicz*, 2020 U.S. Dist. LEXIS 64418 at *7.

### b.    § 3553(a) Factors

Similarly, the application of the § 3553(a) factors militates towards Wren's compassionate release. In considering what is "sufficient but not greater than necessary, to comply with the purposes of [sentencing]", § 3553(a) instructs a court to consider the following:

**(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;

**(2)** the need for the sentence imposed—

> **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> **(B)** to afford adequate deterrence to criminal conduct;
>
> **(C)** to protect the public from further crimes of the defendant; and
>
> **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

**(4)** [the kinds of sentence and sentencing range provided for in the USSG]

**(5)** any pertinent [Sentencing Commission policy statement]

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense

*Sawicz*, 2020 U.S. Dist. LEXIS 64418 at 7, 8 (summarizing § 3553(a)).

First, there are stark differences between the world when Wren was initially sentenced and the world now. Consequently, the overriding factor under § 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic and the serious risk that it imposes on Wren. Although Wren acknowledges the serious nature of the crimes he committed which qualified him for a significant sentence, Wren's actions did not warrant a sentence that includes exposure to life-threatening illness. COVID-19 has already transformed the sentence of 98 inmates in the Bureau's custody into death sentences. Consequently, Wren submits that a reduction, by home confinement or otherwise, of the remaining 30% of his sentence would still reflect the seriousness of his offense.

Furthermore, Wren has been incarcerated for over nine years for the instance offense. During those years, Wren has spent a large portion of his time caring for and assisting elderly and disabled inmates. Wren was such a source of support for these inmates that BOP staff even summoned Wren for help on occasion. Indeed, Wren reports assisting staff in tending to one particular inmate with dementia when

he had violent outbursts. Wren was the only one who his fellow inmate would listen to. Wren has and continues to offer daily care to numerous inmates with disabilities.

Additionally, Wren has managed to avoid any major disciplinary violations while in the Bureau's custody and has paid his $17,500 fine in full.[25] If released, Wren will live with family in Michigan and immediately be gainfully employed by Right House Management as a Maintenance Manager.[26] **Exhibit D**, Right House Management Letter. Wren also looks forward to returning to the music business, and once again capitalizing on his "entrepreneurial spirit" and "talent as . . . a rap producer" that the Court previously recognized. Sentencing Transcript, ECF No. 347, PageID.4815, **Exhibit E**, Studio August Media Letter. With a concrete plan for employment, and no history of violent crimes, Wren will not present a danger to society upon release.

In moving this court for a reduction in his sentence, Wren is not trying to take advantage of the unfortunate circumstances ravaging the country by asking to be released months into his sentence. *See e.g. United States v. Credidio*, No. 19 Cr. 111

---

[25] Wren has been infraction free while in the BOP for the last four years. His most serious offense includes possessing a "dangerous tool," which was a chip for an .mp3 player. Wren's disciplinary history also reflects two failures to stand for count and one abuse of mail incident.

[26] The undersigned acknowledges that no address has been provided to the Court. This was done at the request of Wren, who does not wish for his address to be publicly shared. Such information is available and will be provided to the Court and the government.

(PAE), Dkt. 62, 2020 U.S. Dist. LEXIS 58238 (S.D.N.Y. April 2, 2020) (denying compassionate release of a 72-year old defendant where he had only served two months of a 33 month sentence); *United States v. Butler* No. 18 Cr. 834 (PAE), Dkt. 461, 2020 U.S. Dist. LEXIS 61021 (S.D.N.Y. Apr. 7, 2020) (denying compassionate release for a defendant with asthma because he had only served 15 months out of a 60 month sentence).

Instead, Wren is asking that his sentence, which he has already served the majority of (70%) be reduced in light of his increased vulnerability to catastrophic health consequences should he contract COVID-19. Such a measure would still reflect the seriousness of his offense, but would also take into account the devastating consequences that COVID-19 could inflict on Wren should he have to serve the rest of his sentence. He will get out of eventually get out of prison. The question is whether the theoretical penal benefits of the 30% remaining on his sentence are worth the risk of Wren dying from COVID-19. Our answer is no.

## B.   ALTERNATIVELY, THIS COURT SHOULD PERMIT WREN TO COMPLETE HIS SENTENCE IN HOME CONFINEMENT.

Should this Court decline to reduce Wren's sentence to time served, Wren moves this Court to allow him to complete the remaining 30%  of his sentence via home confinement. *United States v. Pomante*, No. 19-20316, 2020 U.S. Dist. LEXIS 85626, at *9 (E.D. Mich. May 15, 2020) (imposing a "term of supervised release equal to the unserved portion of [the] original term of imprisonment"). Wren would

serve his sentence at his family's home in Michigan, where he would be able to isolate himself and better protect himself from COVID-19, rather than in a BOP facility with extremely high infection rates. Without any sort of relief, there is a very real possibility that COVID-19 will transform Wren's remaining 58  months in prison into a death sentence – as has already happened for nine of his fellow inmates at FCI Elton, including one of his friends.

## III.   **CONCLUSION**

For the foregoing reasons, Defendant requests that this Honorable Court enter an order reducing his sentence.

Respectfully Submitted,

Date: July 23, 2020                    WADE FINK LAW P.C.

/s/ Wade G. Fink
Wade G. Fink (P78751)
*Attorneys for DaJuan Wren*
370 E. Maple Rd., Third Floor
Birmingham, MI 48009
wade@wadefinklaw.com

24

**PROOF OF SERVICE**

I hereby certify that on July 23, 2020, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.

/s/ Wade G. Fink
Wade G. Fink (P78751)
*Attorneys for DaJuan Wren*
370 E. Maple Rd., Third Floor
Birmingham, MI 48009
248-712-1054
wade@wadefinklaw.com
