UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>DAJUAN LAMARR WREN,<br><br>    Defendant. | Case No. 10-cr-20137<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER GRANTING EMERGENCY MOTION FOR COMPASSIONATE RELEASE [539]**

Da'Juan Wren has served approximately 70 percent of his 188-month sentence for heroin and marijuana distribution and for being a felon in possession of a firearm. He wants to be released now because of the COVID-19 pandemic. He claims he is particularly vulnerable to COVID-19 because he suffers from obesity and is showing signs of hypertension and prediabetes and is currently housed at FCI Elkton, a facility with a serious outbreak. For the reasons discussed below, Wren's motion is granted.

**I.**

Wren was indicted for his role in Michael Cathey's drug organization after a wiretap implicated Wren and a search warrant lead to seizure of drug paraphernalia and ledgers, ammunition, and a firearm from Wren's home and automobile. (ECF No. 539, PageID.6530.) Wren was charged with conspiracy to possess with intent to distribute and to distribute heroin and marijuana; he was also charged with being a felon in possession of

a firearm and ammunition. (ECF No. 3.) Wren was ultimately convicted on both counts by a jury. (ECF No. 178.) Wren was originally sentenced to 216 months (ECF No. 323, PageID.3403), but his sentence was later lowered to 188 months (about 15.7 years) following an amendment to the sentencing guidelines. (ECF No. 519.) Wren's counsel calculates that Wren has served approximately 70 percent of his sentence. (ECF No. 539, PageID.6531.) He is scheduled to be released on May 3, 2025. *See Find an Inmate*, Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited August 19, 2020).

Wren, who is 43 years old and is currently incarcerated at FCI Elkton (ECF No. 539, PageID.6531), is now seeking a sentence reduction under 18 U.S.C. § 3582. Wren is classified as severely obese, with a BMI of 44. (*See* ECF No. 539, PageID.6543.) Wren was also apparently told by a nurse in May 2020 that his blood-pressure and blood-sugar results showed he was trending toward hypertension and prediabetes.[1] (*Id.* at PageID.6544.) Wren is worried about being infected with the highly contagious COVID-19. The virus causes a respiratory disease that can result in serious illness or death. The Centers for Disease Control and Prevention (CDC) have identified persons with certain medical conditions, regardless of age, as being at increased risk for severe illness from COVID-19, including those with obesity, defined as having a BMI of 30 or higher. *See*

---

[1] Wren's blood sugar was 123 mg/dl on May 26, 2020. A blood sugar level of 126 mg/dl or higher indicates type 2 diabetes. *See Prediabetes*, The Mayo Clinic, https://perma.cc/F2RZ-VUX7. Wren's blood pressure was recorded as 143/84 and 134/79. Although these readings are somewhat elevated, they are limited to two readings and Wren has not been diagnosed with hypertension. Hypertension is typically diagnosed only after consistently high blood pressure readings on multiple occasions. *See High Blood Pressure*, National Institute of Health, National Heart, Lung, and Blood Institute, https://perma.cc/G5SQ-4QG8.

*People of Any Age with Underlying Medical Conditions*, Centers for Disease Control and Prevention, https://perma.cc/7BQG-Z2R3. And hypertension may also increase the risk for serious illness from COVID-19. *Id.*

The CDC has also issued guidance acknowledging that detention facilities "present . . . unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors." *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention, https://perma.cc/W3JW-4UQX20. These include "low capacity for patient volume, insufficient quarantine space, insufficient on-site medical staff, highly congregational environments, inability of most patients to leave the facility, and limited ability of incarcerated/detained persons to exercise effective disease prevention measures (e.g., social distancing and frequent handwashing)." *United States v. Kennedy*, No. 18-20315, 2020 WL 1493481, at *2 (E.D. Mich. Mar. 27, 2020). As the Sixth Circuit has summarized, the "COVID-19 virus is extremely contagious and conditions favor its more rapid transition in detention or correctional facilities." *United States v. You*, No. 20-5390, 2020 WL 3867419, at *1 (6th Cir. Apr. 22, 2020) (order).

FCI Elkton was previously the site of a particularly bad outbreak: 978 inmates at the facility have tested positive since the start of the pandemic and nine have died. *See COVID-19*, Bureau of Prisons, https://perma.cc/9Q7Z-PVE7. Although a district court in Ohio ordered Elkton to take further measures to control the outbreak and to release the most vulnerable inmates on April 22, 2020, *see Wilson v. Williams*, No. 4:20-00794, 2020 WL 1940882 (N.D. Ohio Apr. 22, 2020), the Sixth Circuit has since vacated the

3

preliminary injunction, *see Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020). The Sixth Circuit concluded that as of April 22, 2020, the BOP had "responded reasonably to the known, serious risks posed by COVID-19." *Wilson*, 961 F.3d at 840. A declaration by the executive assistant/acting associate warden at Elkton, Andrea Burnside, filed in the *Wilson* case details the methods Elkton staff are using to combat COVID-19 in the facility. *See United States v. Brant*, No. 18-20155, 2020 WL 3605282, at *4 (E.D. Mich. July 2, 2020). Prisoners who test positive are being isolated for at least 14 days, and Elkton is also quarantining for 14 days any asymptomatic person who may have been exposed to the virus. *Id.* at *9. The measures Elkton has been taking appear to have made some progress, although there continue to be positive cases. According to the BOP website and government counsel, as of August 20, 2020, there are currently two active prisoner cases and two active staff cases at FCI Elkton. *See COVID-19*, Bureau of Prisons, https://perma.cc/9Q7Z-PVE7.

Wren argues that he should be granted compassionate release because his obesity, and possible prediabetes and possible hypertension, put him at great risk of becoming seriously ill if he were to contract the COVID-19 virus. (ECF No. 539, PageID.6532.) In its response brief, the government concedes that Wren's severe obesity is an extraordinary and compelling circumstance, but argues that Wren should not be granted compassionate release because he is a danger to the community and because the § 3553(a) sentencing factors do not weigh in favor of his release.

## II.

"[O]nce a court has imposed a sentence, it does not have the authority to change or modify that sentence unless such authority is expressly granted by statute." *United States v. Thompson*, 714 F.3d 946, 948 (6th Cir. 2013) (quoting *United States v. Curry*, 606 F.3d 323, 326 (6th Cir. 2010)). As amended by the First Step Act, and upon exhaustion of administrative remedies or the lapse of 30 days from the receipt by the warden of a request for compassionate release, 18 U.S.C. § 3852(c)(1)(A)(i) allows a court to reduce an inmate's sentence if the court finds that (1) "extraordinary and compelling reasons" warrant a reduction, (2) the reduction would be "consistent with any applicable policy statements issued by the Sentencing Commission," and (3) the applicable sentencing factors under § 3553(a) warrant a reduction.

### A.

The statutory exhaustion requirement is mandatory. *See United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). Wren submitted a request to the warden for compassionate release on April 6, 2020. (ECF No. 539-2, PageID.6557.) The warden denied the request on May 7, 2020. (ECF No. 539, PageID.6533.) Wren appealed the denial on May 15, 2020 but has not received a decision. (*Id.*) The government concedes that Wren has properly exhausted his administrative remedies. (ECF No. 541, PageID.6773.)

### B.

Wren must also demonstrate "extraordinary and compelling reasons" to justify his early release.

5

Congress has not further defined "extraordinary and compelling." But the commentary to U.S.S.G. § 1B1.13, adopted before the enactment of the First Step Act, does. Application Note 1 identifies the following "extraordinary and compelling" circumstances: (A) terminal illness diagnoses or serious medical, physical, or mental impairments from which a defendant is unlikely to recover, and which "substantially diminish" the defendant's capacity for self-care in prison; (B) aging-related health decline where a defendant is over 65 years old and has served at least ten years or 75% of his sentence; or (C) family related circumstances. U.S.S.G. § 1B1.13 cmt n.1(A)-(C). Then there is a catch-all in section (D), titled "Other Reasons." That section provides that "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 cmt n.1(D).

District courts across the country have grappled with whether they can find extraordinary and compelling reasons for compassionate release under subdivision (D) given the prefatory language that suggests the issue is to be determined by the "Director of the Bureau of Prisons." But as another court in this Circuit has explained, the dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, "is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act." *United States v. Young*, No. 00-cr-00002, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020). And "[a]lthough it does not appear that any federal circuit court of appeals has addressed this issue, a majority of the district courts that have considered the issue have likewise held,

6

based on the First Step Act, that they have the authority to reduce a prisoner's sentence upon the court's independent finding of extraordinary or compelling reasons." *Id.*

Courts have found that the novel coronavirus combined with other factors can satisfy the catch-all provision. *See, e.g.*, *Loyd v. United States*, No. 15-20394-1, 2020 WL 2572275, at *2 (E.D. Mich. May 21, 2020) *United States v. Pomante*, No. 19-20316, 2020 WL 2513095, at *6 (E.D. Mich. May 15, 2020); *United States v. Oliver*, No. 17-20489, 2020 WL 2768852, at *6 (E.D. Mich. May 28, 2020); *United States v. Amarrah*, No. 17-20464, 2020 WL 2220008, at *6 (E.D. Mich. May 7, 2020). As another court in this district explained, "[t]he common features of the recent cases where inmates have been granted judicial relief on motions for compassionate release due to the pandemic are . . . properly exhausted claims that unreasonably were refused despite the existence of severe, chronic, or terminal conditions that could warrant release even in the absence of a pandemic" or "where the defendants had severe medical conditions which placed them at high risk of coronavirus infection, were housed at a facility with confirmed cases, and had served a large majority of their sentences." *United States v. Nazzal*, No. 10-20392, 2020 WL 3077948, at *3 (E.D. Mich. June 10, 2020).

Speculative concern about catching COVID is not enough. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release."); *United States v. Peaks*, No. 16-20460, 2020 WL 2214231, at *2 (E.D. Mich. May 7, 2020) ("[A] generalized risk of contracting COVID-19 and potentially developing the more severe symptoms is not akin to the type of 'extraordinary

7

and compelling reasons' justifying compassionate release identified by the Sentencing Commission"); *United States v. Smoot*, No. 19-00020, 2020 WL 1501810, at *3 (S.D. Ohio Mar. 30, 2020) ("The mere possibility of an outbreak at his facility does not equate to a compelling enough reason to justify [the defendant's] release.").

Here, the government conceded both in its response brief and at the August 21 hearing on the motion that Wren's severe obesity qualifies as an extraordinary and compelling reason. (ECF No. 541, PageID.6776.) The government notes that the CDC has explicitly identified obesity as a risk factor for COVID-19. (*Id.*) The government's concession comports with other cases in this district in which courts found that obesity, combined with other conditions known to exacerbate the risk of substantial injury or death from COVID-19, was sufficient to meet the "extraordinary and compelling" requirement. *See, e.g.*, *United States v. White*, No. 13-20653-1, 2020 WL 2557077 (E.D. Mich. May 20, 2020) (granting compassionate release to obese defendant with hypertension who had served more than 80 percent of his sentence); *United States v. Readus*, No. 16-20827-1, 2020 WL 2572280 (E.D. Mich. May 21, 2020) (granting compassionate release to defendant with severe obesity, obstructive sleep apnea, hypertension, and prediabetes). The Court thus finds that Wren has met the requirement of establishing an extraordinary and compelling reason justifying his release.

## C.

Even though Wren has cleared the hurdle of extraordinary and compelling circumstances, the sentencing commission policy set forth in § 1B1.13(2) only permits

release if a defendant is "not a danger to the safety of any other person or to the community."

When the Court decided to release Wren on bond pending trial in 2010, it determined that conditions could be imposed such that Wren would not pose a danger to the community. (*See* ECF No. 11.) And for a significant period of time, Wren apparently complied with the conditions of his release and cooperated with pretrial services. (ECF No. 271, PageID.2935.) Although Wren's bond was ultimately revoked prior to sentencing, this was due to his uncooperative behavior and uncertain mental state rather than a finding that he was dangerous. (*See* ECF No. 245; ECF No. 271, PageID.2940.)

The government argues that, despite these prior determinations, Wren now poses a danger because of his drug-dealing conviction, his prior criminal history, and his behavior while incarcerated. (ECF No. 541, PageID.6778.)

Factoring in Wren's 111 months of incarceration, the Court does not believe that Wren's level of dangerousness precludes his release. Wren has never been convicted of a crime of violence. (*See* ECF No. 546, PageID.6917.) Although one of Wren's convictions is for a firearm charge, it was based on being a felon in possession of a firearm. And while "drug trafficking is a serious offense that, in itself, poses a danger to the community," *United States v. Stone*, 608 F.3d 939, 947 n.6 (6th Cir. 2010), this must be balanced against the significant time Wren has already served, his concrete plans for reentry into society (*see* ECF No. 539, PageID.6551), and the danger posed to him by remaining incarcerated.

And the government's other arguments do not alter the Court's conclusion. The government references an incident involving a loaded assault rifle, but all charges

stemming from that incident were apparently dismissed. (ECF No. 546, PageID.6917.) The other prior convictions referenced by the government all relate to false identification. (ECF No. 541, PageID.6778; ECF No. 545-3, PageID.6899.) They are concerning, but do not show that Wren is currently dangerous.

The government only briefly mentions Wren's disciplinary record in prison and argues that "if Wren cannot behave appropriately while incarcerated, the likelihood that he will re-offend is high." (ECF No. 541, PageID.6779.) But a review of Wren's disciplinary record by the Court's probation department showed that all of his infractions were minor (including disposing items in a search, not standing for count, and improper use of the mail). (*See* ECF No. 548-1.) And Wren has had a clean record for the past four years. (ECF No. 546, PageID.6917.) So Wren's prison disciplinary record does not suggest he is a danger to the community.

**D.**

The Court must also consider the § 3553(a) sentencing factors before deciding to grant a motion for compassionate release. The factors to consider include the defendant's history and characteristics; the nature, circumstances, and seriousness of the offense; and the need for the sentence to promote respect for the law, protect the public, and provide adequate punishment and deterrence. In Wren's case, the factors weigh in favor of his request for compassionate release.

Although Wren was convicted of a serious drug-trafficking charge, he has now served approximately 111 months of his sentence. Almost ten years is not an insignificant amount of time served and reflects the seriousness of Wren's crime. The Court finds that

the risks to Wren's health outweigh any additional benefits he would receive from serving out the remaining 30 percent of his sentence.

Wren appears to have strong family support and states that he will live with family in Michigan if released. (ECF No. 539, PageID.6551.) Wren appears to have the abilities and talents needed to secure gainful employment. Wren represents that he has a job waiting for him if he is released and provided the Court a letter from Right House Management offering him a job as a maintenance manager. (ECF No. 539-2, PageID.6568.) He also plans to return to his previously successful career in the music business. (ECF No. 539, PageID.6551.) Wren will also be on supervised release for a number of years, with an appropriate period of time on home confinement while he reacclimates.

In light of the amount of time Wren has served, his lack of a history of physical violence, and his potential to reenter the community as a productive member of society, the Court finds the § 3553(a) factors do not preclude Wren's release.

### III.

Wren has demonstrated extraordinary and compelling reasons to justify his early release. And the Court finds that Wren does not present a danger to the community, nor do the § 3553(a) factors preclude his release. Thus, Wren's motion for compassionate release (ECF No. 539) is GRANTED. His sentence will be reduced to time served and he is to be released from BOP custody immediately.

IT IS FURTHER ORDERED that, upon his release from custody, Wren is to quarantine at home for 14 days. And upon release Wren will begin his four-year term of supervised release, as outlined by the November 21, 2011, Judgment and July 16, 2019,

Amended Judgment (ECF No. 323, 519). For the first nine months, Wren shall participate in the Location Monitoring Program, utilizing technology as directed by the probation officer, and abide by all requirements of the program. The defendant is restricted to his residence at all times, except for employment; education; religious services; substance abuse or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities as preapproved by the probation officer (Home Detention). The Court waives the fees of the program.

If Wren is in full compliance with the conditions of supervised release, the probation officer, after 180 days, may discontinue this condition of home confinement.

SO ORDERED.

Dated: August 28, 2020

                                            s/Laurie J. Michelson
                                            LAURIE J. MICHELSON
                                            UNITED STATES DISTRICT JUDGE